. This honorable appellate court for the second district is now open. The honorable justice George Bridge is presiding along with justices Catherine Easenoff and Joseph E. Burkett. The case is number 220388, Jamal I. Khoury et al., plaintiffs' appellees, versus Stanley Niew, defendant appellant. I would like to start by acknowledging the defendant. The defendant's name is Alexander D. Niew, arguing for the appellant, Alexander D. Marks, arguing for the appellee, William P. Ceriano. Are both parties ready to proceed? Yes, your honor. Very well, Ms. Marks, you may proceed. May it please the court. My name is Alex Marks on behalf of appellant Stanley Niew. At issue before this court is the trial court's creation out of whole cloth, a novel duty to inquire for purposes of finding that an attorney purportedly owed a fiduciary duty individually to firm clients with whom he had no involvement with and perform no work for. This fictitious duty resulted in the trial court finding that Stanley was individually liable for the concealed torts of another firm officer, which he had no knowledge of, nor actively participated in. Counsel, I have a question for you. This law firm was a corporation, correct? Correct. And Stanley was president, and under the bylaws, he was charged with supervision and control over the business affairs of that corporation as well as the employees, isn't that right? Yes, your honor. And he hired the employees or he paid the employees and his wife was one of the employees, isn't that correct? The wife was the 100% owner of the stock and was also an officer of the corporation. So there were two co-equal officers who were the two primary attorneys. Yes, your honor. Right, but in his position as president, why did he not at least have a duty to inquire regarding the funds based on the knowledge that he did have that there were huge amounts of money being paid out to mining companies that he knew had nothing to do with the business of the firm? Well, that's not established in the record that he knew it didn't have anything to do with the business of the firm. The record established that they were not firm clients, but it certainly is not unusual for transactions to occur in the course of business where money is wired out to non-firm clients. Anytime, obviously, a transaction occurs, or in this case, as the Corys were looking to buy real estate property, the money would have been wired to non-firm clients. Obviously, firms deal with non-clients in different transactions. Millions of dollars over a period of time? Millions of dollars fairly regularly? Around the same time, the record indicates that there were other large transactions going in and out of the firm Iolta account, and there's nothing in the record to suggest those were improper transactions. You can imagine, Your Honor, the standard that's being set here, a duty to inquire, which there's no basis in the law for that. But a duty to inquire would then result in a corporate officer overseeing an Iolta account or otherwise having to inquire about every single transaction that occurs within a firm and attempting to ferret out whether there's anything nefarious about it, or in this case, concealed fraud. What about Rules of Professional Conduct 5.1? Rule of Professional Conduct 5.1 is what the trial court relied upon here to hold Stanley responsible. The case law is very clear that a Rule of Professional Conduct cannot form the basis for an underlying cause of action against a party. This is the Prospect Funding Holdings v. Salter case. Although the Illinois Rules of Professional Conduct are a safe guide for professional conduct, and attorneys may be disciplined for failing to observe them, violation of a rule should not itself give rise to a cause of action against a lawyer, nor should it... Counsel, let me ask you, even if the Rules of Professional Conduct does not create an independent legal cause of action, aren't they instructive as to what the... Stanley in this case, or rather Mr. New in this case, had a duty to supervise the other lawyers in the firm? He absolutely has a duty under Rule 5.1 to supervise. In this case, importantly, the record reflects that there was in fact no violation of Rule 5.1. Under 5.1c2 specifically, a lawyer is only obligated for the torts of another attorney in the firm if he has actual knowledge of the fraud or the tort and fails to do something about it. Here, the record reflected that Stanley had no knowledge whatsoever. As a follow-up to Justice Zinoff's question, this trust account ledgers had plaintiff's funds going in and out. As the firm president, didn't he have an obligation and monitored this activity? And as the trial court ruled in this case, had a duty to inquire? Well, first, the record, I think at minimum reflected that there was a fact question as to whether Stanley was in fact doing all he was required under Rule 115. The record, the facts of this case are that Stanley attended seminars to ensure that the firm complied with IALTA rules. Once a month, he would meet with the firm bookkeeper and go over the account ledger. He would always ask the bookkeeper if there was anything he needed to know. And importantly, the quarries admitted in this case that they had no evidence that Stanley in any way violated any professional standard rule as to how the IALTA account was handled. What the court here has created... Mr. Marks, if he was doing all that he was required to do, why wasn't there any written policy regarding the administration of the firm's IALTA account as required? I don't think there's anything in the record that there was something missing or absent from the requirements of how the IALTA account was administered. This was a fraud conducted by an officer of the corporation. The fraud was concealed. The evidence... And there was a written policy regarding the administration of the account? I'm not sure the record reflects one way or another whether there was a written policy. I know that the firm policy was to follow all the written rules and regulations for IALTA accounts, and the quarries admitted that they had no evidence that somehow any rule 1.15 or otherwise relating to the administration of this account was somehow violated. But you can imagine here, think about... This is a smaller law firm. Think of a larger law firm, the duty that would be established here, where there are hundreds of thousands of transactions that occur. I'm at a 75-person firm. There are thousands of transactions going in and out of my firm from various different departments involving various clients and non-clients. To have a situation where someone supervising an IALTA account would have to inquire as to every single transaction to try to detect or ferret out fraud is the standard that's been established here. It's essentially a strict liability standard that an officer of a corporation, if they fail to detect fraud, somehow is strictly liable for the acts of the tortfeasor and to the victim. And there's nothing that establishes that rule in Illinois. There's no law supporting that in Illinois. Certainly, here, the clients, the quarries, have avenue of recourse, which were to sue the firm and sue the tortfeasor, but to hold Stanley individually liable, somehow finding that he had a fiduciary duty individually to firm clients that he never dealt with and to say that he had some amorphous standard to inquire as to every single transaction to try to detect the concealed fraud goes a step too far and is unsupported by Illinois law. Mr. Marks, wouldn't a ruling in your favor encourage attorneys, especially attorneys in a supervisory or management role, to essentially turn a blind eye to the ethical and legal violations of the other attorneys within their firm? Not at all, because there are two different avenues here where attorneys can be held responsible. There are professional malpractice claims, which importantly here, the quarries expressly disclaim, quote, Stanley seems to think that this case is a legal malpractice case that depends largely upon the existence of an attorney-client relationship between plaintiff and Stanley. However, this case is not a legal malpractice case. Indeed, it has little, if anything, to do with the negligent provision of legal services. So you have one avenue of relief or recourse of malpractice, and you have another avenue of recourse where the rules of professional conduct, which are overseen by the Illinois ARDC and attorneys may be held liable, in your example, if Stanley were to turn a blind eye. That is a far cry, however, from bringing in a breach of fiduciary duty claim against a corporate officer individually and holding him individually liable for an act he had nothing to do with, which he, it was concealed from him, which he had, the record reflected he took all reasonable steps to administer the IOTA account and was, did not detect that a fraud was occurring to somehow then hold him strictly liable, which is really the standard here the trial court has set down. Again, it's not supported by any Illinois law, any case. We've cited to this court itself, the, well, the Prospect-Holding v. Salter case, but then also the Zoll v. Krupka case, in which essentially a similar fact pattern here where a CEO failed to detect fraud conducted by the company president, two officers, one that was supervising the other, and this court said that the court should only consider the facts available to the CEO at the time of the complaint of conduct and not what may appear through the exercise of hindsight. And importantly, this court set forth very clear standards as to when a corporate officer may be held liable. This case is unique, isn't it? Stanley and Catherine were not just partners in the law firm where he was president, she was the sole shareholder. They were also married. The court did consider that the fact that they were married and we've taken the position that there was absolutely no law whatsoever in Illinois or otherwise that would support the ability of a court to somehow consider marital status as a basis to somehow institute some sort of heightened or extra legal duty. Marital status does not confer knowledge. Indeed, as demonstrated in this case, not only did Kathleen conceal all of her acts from Stanley, but Jamal Corey, the plaintiff, concealed the crimes that he was committing from his wife, Lita, at the same time. Spouses can and do conceal things. We set forth in our brief, Justice Burkett, numerous examples of various relationships where there would be no clear demarcation point as to where a court may draw the line as to the relevance of considering the relationship. Simply to presume that there are extra legal duties for married lawyers who are practicing together has no support under Illinois law. Was there a forensic audit of the income and spending of the news? I'm not understanding your question, Justice. Forensic audit to determine whether or not the income that Kathleen got from stealing the money benefited Stanley. Was there any evidence? I'm sorry, the audio of your last question. Was there a forensic audit? Was there a forensic audit? Well, my understanding is in the criminal matter against Kathleen New brought in the Northern District of Illinois. Yes, there was a forensic auditing of the firm accounting. There was some restitution to the plaintiffs and so forth. Turning back to the Krupke case, though, I think it's very important where this court set forth the standards of when a corporate officer may be held individually liable. And what this court said very clearly in that case is that if there is an officer who is supervising a subordinate, a subordinate officer who is not a co-equal, there is potential liability if the officer failed to exercise ordinary care. However, if the officer is a co-equal with the tortfeasor, as you had a situation here, two corporate officers, and in fact, one could argue that Kathleen was actually above Stanley since she owned 100% of the stock of this corporation. But co-equal officers, the individual liability only arises if the officer actively participates in the wrongdoing. That's not what happened here. The facts are very clear. Stanley had nothing to do this. And importantly, in Zalver's Krupke, that was a case where the plaintiffs brought claims for breach of contract, fraud, and negligent hiring and supervision. None of those claims were asserted here. The only claim that was asserted here was a breach of fiduciary duty. And the law in Illinois is very clear that to establish a fiduciary relationship, you either have to have an attorney-client relationship, which the Corey's conceded here that Stanley was not representing them, or you have to establish through clear and convincing evidence that they placed such trust and confidence in Stanley that he gained influence and superiority over them. And they admitted in this case that Stanley didn't exert any influence over them, including with respect to decisions they made regarding the work they hired Kathleen to perform or the funds they transferred into the new legal account. There was simply no basis under the law here to hold that there was a fiduciary relationship established, number one. Number two, there is no such fiduciary duty to inquire. That standard was crafted by the court, pulling together various different factors which are not supported under Illinois law. And as I stated, I think that the court needs to consider what will occur here if this ruling is affirmed. You have a situation where it will... in a similar manner to requiring all attorneys in a firm to owe all firms' clients this fiduciary duty. Yes, Your Honor, it's an excellent question. So there's a distinction between running a conflict check to be able to represent the client and actually representing the client. Firms, large and small, run conflict checks to make sure there is no conflict, business or otherwise, in order to initiate the representation. But that check, which protects both the client and the firm, doesn't create a fiduciary duty between the client and every single member of that firm. There's a fiduciary relationship between the client, the specific attorney, and the firm at best. But the rest of the lawyers cannot possibly be held to such a duty. And again, here it would be a situation where you would be holding an attorney who had absolutely nothing to do with the underlying tort and never represented the attorney. Somehow they would be held strictly liable for the concealed torts of another firm member, which... I ask you this because, as you know, conflicts of interest are imputed to all of the attorneys in a firm, in the same firm. And why shouldn't a fiduciary duty be similarly applied to all of the attorneys in a firm? Because you're comparing two different things, Your Honor. You're comparing, one, a rule of professional conduct, which is a standard that governs the conduct of attorneys and how they conduct their practice as an attorney in the field or profession of law. Separate and apart from, however, tort law, which governs conduct towards a third party. And the courts have been very clear, including the prospect funding holding case, that you can't conflate the two. And this makes sense. Tort law, like fiduciary duty, is designed to address and provide remedies for a party's conduct directed towards a third party. Here, Stanley didn't do anything towards a third party. Conversely, the rules of professional conduct provide guidance of how an attorney is supposed to act professionally. Stanley was bound by those rules of professional conduct here. But that can't substitute for a cause of action under tort law towards a third party, of which he was not the tortfeasor and he did nothing wrong towards them. And I think you'd be setting a very dangerous precedent if you were somehow allowing future litigants to seek to hold attorneys individually liable under tort theories based on the rules of professional conduct. In other words, utilizing professional conduct rules to subvert civil legal standards. I see I'm up on my time. I want to thank you. Your time is up. Apologize for interrupting you. Does either justice have any additional questions, Mr. Marks? Not at this time. All right, very well. Mr. Marks, at the end of the appellee's argument, you will have an opportunity for rebuttal. Thank you very much, Justice Bridges. Mr. Reano, you may begin your argument. Good morning, Your Honors. May it please the court. I'm William Seriano, and I represented the Currys in the underlying case and here on appeal. I think we have to keep in mind what the trial court did here. The trial court did not rely on any specific factor, but looked at all of the undisputed facts and circumstances of this case. And those were many and diverse. We've already mentioned, Judge Parkett mentioned that Stanley and Kathleen were husband and wife. They live together. They work together in not a large firm. It was a two person firm. It operate out of a single location. Mr. Seriano, I have a question. How can a possible violation of the rules of professional conduct be the basis for a cause of action against an attorney? I don't think, Judge Sennoff, with all due respect, that that was the sole basis for the court finding a breach of fiduciary duty or a breach of fiduciary cause of action here. A breach of fiduciary can exist based on all the facts and circumstances. And the existence of a rule of professional conduct was one factor that the judge took into account. But I don't think that was the sole factor that the court relied upon. What was the fiduciary relationship that was established here? I mean, there was no attorney-client relationship established, was there? No, but I think if you look at the Mulroy case, the existence of the fiduciary duty arose by virtue of Stanley News firm taking possession of my client's funds into a trust account. And as the Mulroy case says, that is the height of fiduciary responsibility. Ingray Mulroy is not on point. Ingray Mulroy, it was the lawyer representing the clients. Mulroy was representative. That's not the case here. There was a fiduciary relationship. There was an attorney-client relationship in Mulroy. There is not here, and you've admitted that. Yeah, I understand that, Judge Burkett. But the issue is to whom does that fiduciary duty extend? And it obviously extends to the lawyer who represents a client. And I think what the court said is based on the undisputed facts and circumstances of this case, it also extended to Stanley New. He was the president. He had responsibility. He was in a two-person firm with his wife, with whom he lived. He looked at the ledger account. I apologize for interrupting you, but didn't the Mulroy case speak to a duty arising only when the attorney agrees to hold the funds? And that isn't the case that we have here. Well, no, the firm agreed to hold the funds. No, we're not talking about the firm. I'm talking about Stanley. Stanley never agreed to hold these funds. And Mulroy addresses a situation where the attorney agrees, specifically agrees to hold the funds. That's not the case here. Well, the funds were paid to the firm. Stanley New was the president of the firm, had signature authority on that account, and had responsibility for managing it. So is that where you find the fiduciary relationship by his being president of the firm? I mean, how did that establish a fiduciary relationship? That has to be primary, right? I mean, there has to be that relationship before then there's a duty. I agree, Judge Sanoff. And I'm going to resist any effort to point to one particular fact, undisputed fact in this case, as the basis for a fiduciary relationship, because I don't think that's what the court was doing. I think the trial court looked at everything in this case, all of the circumstances, including the rules of professional conduct, including that he was a president, including that he exercised authority over the account, had signature authority on it, including the fact that he was married, looked at all of those things and said in the circumstances of this case. And I think Judge Burkett, you referred to it earlier as being a unique situation. In the circumstances of this case, the court found that Stanley New owed a fiduciary relationship to the Corys. Counsel, do you contend that Mr. New owed plaintiffs a fiduciary duty as a matter of law or as a matter of fact? It really is kind of, I think, a combination of both. But I think what the trial court did was it said as a matter of the undisputed facts in this case that there was a fiduciary duty on the part of Stanley New to the Corys with respect to the funds placed with his firm in that trust account. In brief, you say that a fiduciary duty can be based on trust and confidence by reason of friendship, etc. And then you cite three cases, which I read. None of those cases support your position in this case. Curdie v. Fox Valley, that was a doctor who sued his former employer. Did not have a fiduciary or confidential relationship. Bentley v. Bussey Bank isn't on point and neither is Melco. Does any of these cases apply to the facts of this case? I think Judge Burkett, when we cited those cases, we cited those because those are cases on which the appellate relied to say there was no fiduciary duty in this case. And we were pointing out that those cases essentially don't apply. Those are just general principles of when a fiduciary duty is created. But we weren't relying on those cases for purposes of creating a fiduciary duty here. We were saying in this unique set of circumstances here, as the trial court found, we believe there was a fiduciary duty created. Do you have any case law that suggests that being married to a court feature creates a fiduciary relationship? No, but again, I'm going to resist relying on that one factor. Go ahead. I was just going to say, as Justice Burkett was alluding to, the cases that you cite, none of them say anything about the duty of an attorney to safeguard non-client's funds, do they? If what you're saying is, do any of those cases say that the duty to safeguard a client's funds extend to other lawyers in a firm? I don't have a case that specifically says that. But in the circumstances of this case and the undisputed facts of this unique case, I think it was fair for the judge to extend that fiduciary duty to Stanley New. For discipline to be imposed on Stanley New as a lawyer, if the ARDC were to take the action, they would have to prove by clear and convincing evidence that Stanley New was aware of the fraud that was going on, correct? I presume that is the standard, correct? That's the rule. So that's the standard for purposes of disciplinary action. Why should it be different for purposes of determining liability for a court? Well, because the ARDC is not looking at the same cause of action that this court and the underlying court looked at. They're looking at a breach of fiduciary duty. You rely upon the rules to create a duty. You can't have them both ways, can you? I rely on the rules as a factor in creating a duty. So the factors you're talking about is they were married, he was president, there's a rule of professional conduct, that's it? That's what we're talking about? No, I think what they... What else was there? Well, there was one IOTA account. Stanley New had signature authority on it. He reviewed the account at least once a month, according to his testimony. The ledger that he saw identified funds coming in specifically from the Currys and going out to mining companies that he said they don't do any business with. He was prior to the deposits, as you pointed out earlier, there were massive deposits coming in and out of that account that were the Currys. Prior to that, there had been very little activity in that account. And after that, there was very little activity in that account. So all of these factors, and I think our brief really cites 19 or so factors, including the past disciplinary history of both Stanley and Kathleen, the court looked at all of those things. And they were undisputed and said, those are the things that I'm looking at. It's not just that they're married, that they're in a firm, it's all of these things. Well, how would past disciplinary action be relevant to what happened here? I think what the trial court looked at that for purposes of was to say there was some heightened concern or should have been some heightened concern on the part of Stanley New for the prior conduct of Kathleen New. She was a signatory on this account with past disciplinary proceedings, including one in which she forged notarized signatures of clients that perhaps she should not have been on the account. And when Mr. Marks talks about, oh, this is going to be horrible for big firms. I was a partner in General Block. I did not have access to the firm trust account. I couldn't write a check off of it. I had to go to somebody and justify any money that I was asking be dispersed from a client trust account. Those were very strictly managed. They were handled with absolute discretion all the way through. And we're not imposing some huge burden on Mr. Marks, a 75-person firm. I'd be willing to wager that Mr. Marks can't go in and write a check on the firm trust account, that he's got to make some kind of showing before he can do that. So, are you, is it your position, because you've talked about the large firm that you were with, General Block. Is it your position that every attorney in a firm owes a firm's, all the firm's client this fiduciary duty? I don't think, Judge Bridges, that you have to go there to affirm the trial court in this case. My personal view is, and I know from my experience, as I'm sure Mr. Marks does, is that large firms don't have this problem. Because they don't permit access to client trust accounts by everybody in the firm. They're strictly managed. They're highly controlled. They do the sorts of things that Stanley knew never did. As the court said, he did nothing. Mr. Serrano, you understand. So, where do we draw the line? When do we start considering a firm when we want to extend this fiduciary duty to a non-client, you know, attorneys in a firm? When do we do it? A two-person firm? A five-person firm? So, that's why I asked you that question. When do we decide that they're responsible, even with all of the control that you've talked about? And I understand your question. And I'm not here to advocate for a general rule, necessarily. I'm here to say, wherever you draw that line, Stanley knew falls within the ambit of somebody who should be held personally responsible because of the unique facts and circumstances of this case. So, I would encourage, Your Honors, based, again, on the unique circumstances of this case, and given the way that the trial court considered all of those facts and circumstances, which were undisputed, that this court affirm what the trial court found and affirm the trial court's decision, holding Stanley knew personally responsible. Thank you, Mr. Shrown. Does either justice have any additional questions, Mr. Shrown? No. Just one very quickly. In your brief, you did not respond to the argument that 5.1c, with regards to responsibility for the conduct of other lawyers. What's your response to that? My response to that is, yes, 5.1c does create ethical obligations on the part of attorneys. But, again, the rules of professional conduct here were one factor that were used. And I'm not advocating here that 5. I'm sorry, Judge. In your response to me, you did not respond to that argument. Yeah, I understand, because I don't think it's relevant. I think we're not using 5.1c the way that the appellant here says we're using it. We're not using it to create a cause of action. Thank you. Thank you, counsel. Mr. Marks, you may proceed with your rebuttal. Thank you, Justices. I just have three very short points. First, Illinois law is very clear, and I'm not aware of any law that says otherwise, that for an attorney to owe a client a fiduciary duty, there either has to be an attorney-client relationship, or through clear and convincing evidence, the client's placed such trust and confidence in that attorney that the attorney gained influence and superiority over them. Those standards were simply not met here. There's no suggestion that there's law holding otherwise, and we've cited the Bosak case as one example where a summary judgment was granted in favor of an attorney, as there was not clear and convincing evidence of the existence of fiduciary relationship. Point number two. It seems that Mr. Soriano is largely relying on, because he seems to have backed away that 5.1 somehow created a cause of action, he's largely relying on the fact that Stanley was the firm's president, that somehow that created a fiduciary duty to the Corys. Illinois law is also very clear on that point. This is the Merges v. Bowman case. The only duties that were created by Stanley's role as firm president were to the firm. That Burgess case says an officer or director, lawyer in a professional corporation and partners in a law firm owe a fiduciary duty to the law firm. So his role as president would have created a duty to the firm. It doesn't create necessarily an individual fiduciary duty to a firm client he doesn't represent and had no dealings with. Point number three. This might be the most important of all the points. In Mr. Soriano's brief, the appellee's brief, they made the argument, and it was echoed here, about somehow trying to limit the scope of this ruling. They said in their brief, the unique facts of this case will undoubtedly serve to limit the scope of this court's decision to affirm the trial court. And Mr. Soriano here a couple times said it. Oh, Mr. Marks' firm, they don't have this problem. Larger firms don't have this problem. I worked at Jenner & Brock. We didn't have this problem. The ruling that would be affirming here, I think, will create a grave risk for any small firm continuing to operate, because what's going to happen is someone in a small firm is going to look at this ruling and say, wait a minute. You're telling me, contrary to Illinois law, I owe a fiduciary duty to some client I didn't do any work for, and I'm going to be held individually liable if I don't catch and ferret out and discern the fraud one of the partners in my firm may be doing, despite I'm doing everything else right, why would I ever work at a small firm? Or somehow if I'm related or a cousin of or a good friend of or a former partner of or a divorced attorney from another partner in this small two-person, five-person, eight-person, 10-person law firm, why would I ever risk that? I'm going to go to the Jenner & Brock, as Mr. Soriano said, because they don't have these problems. You can't possibly make a ruling that somehow the unique facts of a small firm somehow raise a heightened standard of duty above and beyond what would be held of an attorney at a larger firm. It's inequitable. There's no basis under that in the law. And again, we have to come back to what was alleged here. It was a breach of fiduciary duty. Was a fiduciary duties relationship ever established here? And it simply wasn't. The Corey's had their relief. They sought it against the firm and the actual tort fees are Kathleen New. But to hold an individual attorney individually liable for the concealed torts of someone else is a strict liability standard that is going a step too far. And for these reasons, the trial court's June 23rd, 2020 order not only should be reversed, your honors, but summary judgment should in fact be entered in my client Stanley New's favor because there simply was no fiduciary relationship individually between him and the Corey's. Unless you have any other questions, I appreciate your time today. Thank you. Thank you, counsel. Does either justice have any additional questions? I do not. Very quickly, what is your response to the argument that essentially that 5.1c of the rules does not apply here? Well, there's I think he's conflating two different issues and mixing apples and oranges. 5.1c certainly applied to Stanley as it applied to any officer of a corporate or any any attorney who's supervising the firm. You have a duty, a rule under the rules of professional conduct to abide by that rule of professional conduct. 5.1c certainly does not create an independent cause of action. If there's a violation of the rule, the ARDC addresses it, it doesn't somehow create a fiduciary relationship, number one. Number two, I agree with him in the sense that 5.1c doesn't apply here because 5.1c gives rise to supervisory liability only when there's actual knowledge of the tort that's being committed. And here it doesn't apply because the evidence is very clear that this was concealed not only from Stanley as it was going on, but the record reflects he didn't even have knowledge of this lawsuit until it was many months in and he inadvertently found out about it. And the record reflects Kathleen hid not only the conduct she was doing at the time, but she tried to hide even the mere fact of this lawsuit from him. And as the federal indictment of Kathleen indicated, quote, she hid and caused to be concealed and misrepresented her scheme to defraud. And so Stanley, certainly there's nothing in the record to indicate that Stanley had any knowledge of this. So I would agree that 5.1c doesn't apply from the standpoint that there would be no reason to have a disciplinary proceeding against Stanley in his supervisory role because he didn't have actual knowledge. Any additional questions? And I have no questions as well. The court at this time wish to thank both parties for your arguments this morning. The case will be taken under advisement and a disposition will be rendered in due course. Mr. Clerk, you may close the case and terminate these proceedings. Thank you. Thank you, Your Honors.